UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IMMERSION CORPORATION,<br><br>                Plaintiff,<br><br>        v.<br><br>SONY COMPUTER ENTERTAINMENT<br>AMERICA LLC, et al.,<br><br>                Defendants. | Case No.  16-cv-00857-RMW<br><br>**ORDER GRANTING PETITION TO<br>CONFIRM ARBITAL AWARD**<br><br>Re: Dkt. Nos. 1, 38 |

Plaintiff Immersion Corporation petitions this court to confirm an arbital award against defendants Sony Computer Entertainment America LLC and Sony Computer Entertainment Inc. (collectively, "Sony") under the New York Convention. Dkt. No. 1. Sony opposes the petition and requests that the award be vacated pursuant to Article V of the New York Convention and §10 of the Federal Arbitration Act. Dkt. No. 38. The court heard argument on April 1, 2016. For the reasons set forth below, the court grants Immersion's petition to confirm the award. Sony's motion to vacate is denied. Immersion's request for attorney's fees is denied.

## I.        BACKGROUND

Immersion is incorporated in Delaware and owns several patents covering digital touch technologies. Sony Computer Entertainment America LLC is incorporated in Delaware, and Sony Computer Entertainment Inc. is incorporated in Japan. Sony manufactures, markets, and

United States District Court
Northern District of California

distributes PlayStation systems. In 2002, Immersion sued Sony in the Northern District of California, asserting that certain Sony PlayStation products infringed its patents. The court entered final judgment in Immersion's favor, and the parties subsequently entered into a 2007 settlement agreement resolving the litigation and establishing "a new business relationship." Dkt. No. 38-2 at 1. Under the 2007 agreement, Immersion granted Sony a license to manufacture "royalty bearing" products in exchange for the payment of royalties. *See id.* The agreement defines "Royalty Bearing Products" as products that 1) contain "the physical means . . . that create tactile sensations that can felt by the user and 2) are "covered by at least one Immersion Patent in the country or area where such unit is manufactured, sold, used or distributed." *Id.* ¶ 5.4(b). Section 4.3 of the 2007 agreement provides for arbitration of certain disputes between the parties, including "whether a particular product or service of the Sony Entities is a Royalty Bearing Product." *Id.* ¶ 4.3(a).

In 2014, a dispute arose between the parties as to whether DualShock® 4 controllers sold by Sony in Japan are "Royalty Bearing Products." In particular, the parties were unable to agree whether the DualShock® 4 controllers are covered by one of Immersion's Japanese patents—the '301 patent. Pursuant to the arbitration clause in the 2007 agreement, the parties arbitrated the dispute with retired United States District Judge James Ware presiding. The arbitrator issued a Final Award on December 22, 2015, declaring that "Sony's DS4's Wireless Controllers manufactured, sold or distributed in Japan after April 8, 2014 were and are 'royalty bearing' products as defined by Paragraph 5.4 of the 2007 Agreement." Dkt. No. 38-4 at 23. The arbitrator indicated that the award addressed all issues presented for determination in the arbitration proceeding. *Id.*

Immersion petitions this court to confirm the award, arguing that Sony "has no legitimate basis for opposing" Immersion's petition. Dkt. No. 1. Sony opposes Immersion's petition and moves to vacate the award on three grounds: 1) the award is contrary to the well-established policy of the United States because the arbitrator precluded Sony from asserting an invalidity defense, 2) the arbitrator refused to hear evidence pertinent and material to the controversy—specifically prior art evidence relating to non-infringement under Japanese law, and 3) the arbitrator manifestly disregarded Japanese law by failing to determine the extent of direct infringement as a necessary

16-cv-00857-RMW
ORDER GRANTING PETITION TO CONFIRM ARBITAL AWARD
FC

predicate for a finding of indirect infringement.

## II.   IMMERSION'S PETITION TO CONFIRM AND SONY'S MOTION TO VACATE

Immersion asks this court to confirm the award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), which is implemented by the Federal Arbitration Act ("FAA") at 9 U.S.C. §§ 201-08. Dkt. No. 1 at 1. The arbitration award falls under the New York Convention because it arises "out of a legal relationship . . . which is considered as commercial" and involves a party that is not a citizen of the United States—Sony Computer Entertainment Inc. *Id.* § 202. This court must confirm the award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." *Id.* § 207.

Sony opposes Immersion's petition and asks the court to vacate the award pursuant to Article V of the New York Convention and § 10 of the FAA. There are seven grounds for refusing to confirm or vacating an award under Article V of the New York Convention.[1] In this case, Sony

---

[1] Article V states:
1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
(a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or
(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or
(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.
2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:
(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or
(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

argues that "recognition or enforcement of the award would be contrary to the public policy" of the United States under Article V(2)(b). Sony also argues that it may challenge the award based on the grounds provided for in the FAA, specifically under §10(a)(3) for failure to consider pertinent and material evidence and under §10(a)(4) for manifest disregard of the law.[2] *See* Dkt. No. 55 at 9. Immersion contends that the "Convention's enumeration of defenses is exclusive" and that Sony may not challenge the award on FAA grounds. Dkt. No. 45 at 17.

Article V(1)(e) of the New York Convention provides that a court may refuse to confirm an award that has been "set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Therefore, Sony argues, the "Convention specifically contemplates that the state in which . . . the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *Zurich Am. Ins. Co. v. Team Tankers A.S.,* 811 F.3d 584, 588 (2d Cir. 2016), *quoting Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,* 126 F.3d 15, 23 (2d Cir. 1997). Sony notes that this approach has been adopted by other circuits, as well as by a district court in this circuit. *See, e.g.*, *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account*, 618 F.3d 277, 292 (3d Cir. 2010), *as amended* (Dec. 7, 2010) ("When both the arbitration and the enforcement of an award falling under the Convention occur in the United States, there is no conflict between the Convention and the domestic FAA because Article V(1)(e) of the Convention incorporates the domestic FAA and allows awards to be 'set aside or suspended by a competent authority of the country in which . . . that award was made.' Here, because the arbitration took place in Philadelphia, and the enforcement action was also brought in

---

[2] 9 U.S.C. § 10(a) states:
In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
(1) where the award was procured by corruption, fraud, or undue means;
(2) where there was evident partiality or corruption in the arbitrators, or either of them;
(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

4

Philadelphia, we may apply United States law, including the domestic FAA and its vacatur standards."); *LaPine v. Kyocera Corp.*, No. C 07-06132 MHP, 2008 WL 2168914, at *5 (N.D. Cal. May 23, 2008) (finding that for awards rendered in the United States under the New York Convention, "the appropriate standard of review is under both Article V and 9 U.S.C. section 10.")).

Immersion argues that the application of FAA defenses is still an open question in the Ninth Circuit. Dkt. No. 45 at 17 n.4 (citing *LaPine*, 2008 WL 2168914 at *5 ("[w]hether, in addition to the grounds specified in Article V of the Convention, the 'domestic' standards embodied in Chapter I of the FAA apply to review of an arbitral award falling under the Convention and made in the United States under American law is an open question in the Ninth Circuit.")). However, the weight of authority favors applying FAA defenses to New York Convention arbitration awards made in the United States. Immersion cites one Eleventh Circuit case addressing an award rendered in the United States and holding that "no defense against enforcement of an international arbitral award under Chapter 2 of the FAA is available on [any] grounds not specified by the Convention." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1446 (11th Cir. 1998). However, the Eleventh Circuit did not explicitly address the effect of Article V(e)(1). This court is not aware of any other authority holding that domestic standards of review do not apply to an arbitration award falling under New York Convention but made in the United States.

In the absence of further guidance from the Ninth Circuit, the court interprets Article V(e)(1) as contemplating review by a competent authority of the country in which an award was made. Therefore, the court considers Sony's arguments for vacating the award under both the New York Convention and the domestic standards for review under the FAA.

### A.  Public Policy

Sony seeks to vacate the award because it "awarded royalties based upon a finding of indirect infringement of the '301 Patent, but did so while barring Sony from raising any invalidity defenses" in violation of the public policy against excluding invalidity defenses. Dkt. No. 38 at 11.

5

United States District Court
Northern District of California

Immersion responds that 1) Sony cannot raise a public policy challenge now that it did not assert in arbitration, 2) Sony has not shown that the award violates the "most basic notions of morality and justice" in the United States, as required for application of the New York Convention's public policy defense, 3) the court may not engage in de novo review of the arbitrator's interpretation of the arbitration agreement, and 4) the public policy identified by Sony does not specifically militate against the relief ordered by the arbitrator because it is irrelevant to the facts of this case.

### 1. Obligation to Raise Argument in Arbitration

Immersion objects to Sony's public policy arguments on the basis that Sony did not raise its public policy concerns during the arbitration. Dkt. No. 45 at 4, 12 (citing *Marino v. Writers Guild of Am., E., Inc.*, 992 F.2d 1480, 1484 (9th Cir. 1993) ("it is well settled that a party may not sit idle through an arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrators when the result turns out to be adverse")). In *Marino*, the challenging party objected to the arbitration *procedures* only after the award issued. In this case, Sony challenges the enforcement of the award itself as contrary to public policy, and a "question of public policy is ultimately one for resolution by the courts." *Aramark Facility Servs. v. Serv. Employees Int'l Union, Local 1877, AFL CIO*, 530 F.3d 817, 823 (9th Cir. 2008). Furthermore, Sony argued during the arbitration that the scope of the arbitration should include its invalidity defense, and that release of such defenses requires a clear and unambiguous waiver. *See, e.g.*, Dkt. No. 45 (Sony's Brief Concerning the Availability of Invalidity Defenses in the Arbitration, dated November 7, 2014) at 3 (citing *Baseload Energy, Inc. v. Roberts*, 619 F.3d 1357, 1362 (Fed. Cir. 2010)). Therefore, the court finds that although Sony did not expressly argue that the arbitrator was violating public policy during the arbitration, Sony raised the facts it now uses to support its public policy argument and maintained that waiver of an invalidity defense must be clear and unambiguous.

### 2. Legal Standard for Public Policy Defense

The parties do not agree on the legal standard for application of the public policy defense. Immersion argues that "[i]n recognition of a presumption favoring upholding international

16-cv-00857-RMW
ORDER GRANTING PETITION TO CONFIRM ARBITAL AWARD
FC

arbitration awards under the Convention," the public policy defense "is 'construed narrowly'" and "applies only when confirmation or enforcement of a foreign arbitration award 'would violate the forum state's most basic notions of morality and justice.'" *See* Dkt. No. 45 at 12 (quoting *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1096-97 (9th Cir. 2011)). On the other hand, Sony contends that there is another applicable standard in this circuit, under which the court must "(1) find that an explicit, well defined and dominant public policy exists . . . and (2) that the policy is one that specifically militates against the relief ordered by the arbitrator" in order to vacate an award on public policy grounds. Dkt. No. 38 at 12 (quoting *Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1111 (9th Cir. 2012)).

Sony does not appear to dispute that the New York Convention Article V(2)(b) public policy defense applies only where confirmation would violate the forum state's most basic notions of morality and justice. Nor does Sony argue that enforcement of the award would violate this country's most basic notions of morality and justice. However, although the award at issue is governed by the New York Convention, the arbitration was conducted in the United States. As previously discussed, Sony may challenge the award under both the New York Convention and the FAA standards of review. Therefore, the court considers whether a public policy challenge is available to Sony under the FAA.

Violation of public policy is not one of the enumerated grounds for vacating an award under § 10 of the FAA. *See supra* n. 2. There is, however, a judicially-created public policy basis for refusing to enforce an arbitration award. *See United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987) (explaining that refusal to enforce an arbitral award which is against public policy is "a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy") (citing *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)). Although the public policy defense to enforcement developed primarily in the context of labor dispute arbitrations, it has been applied to FAA review of arbitration awards. *See, e.g.*, *U.S. Life Ins. Co. v. Ins. Comm'r of California*, 160 F.

7

App'x 559, 563 (9th Cir. 2005), *as amended on denial of reh'g and reh'g en banc* (Jan. 10, 2006) (noting in FAA case that "the Supreme Court has recognized in principle that an arbitral award that violates public policy may be vacated for that reason"); *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001) (recognizing "a handful of judicially created reasons," including violation of public policy, for vacating an arbitration award in addition to the enumerated grounds in the FAA); *Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir. 1980) ("Although contravention of public policy is not one of the specific grounds for vacation set forth in section 10 of the Federal Arbitration Act, an award may be set aside if it compels the violation of law or is contrary to a well accepted and deep rooted public policy.").

In *Hall Street Associates, L.L.C. v. Mattel, Inc.*, the Supreme Court held that "§§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification." 552 U.S. 576, 584 (2008). The *Hall Street* decision addressed whether the provisions in §§ 10 and 11 of the FAA were "open to expansion by agreement" of the parties; the Court did not reject or even discuss public policy as grounds for vacating an award. Nonetheless, the *Hall Street* decision has resulted in some uncertainty as to the continuing validity of non-statutory grounds—such as violation of public policy—as a basis for vacating an arbitration award. *Compare, e.g.*, *Titan Tire Corp. of Freeport v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 734 F.3d 708, 717 (7th Cir. 2013) ("*Hall Street* Court did not overrule *Eastern Associated Coal* or *W.R. Grace*, both of which recognized a public policy exception to the general prohibition on overturning arbitrator awards"), *with Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1324 (11th Cir. 2010) ("We hold that our judicially-created bases for vacatur are no longer valid in light of *Hall Street*.").

While the Ninth Circuit has not explicitly addressed the validity of a public policy as the basis for vacating an arbitration award under the FAA after *Hall Street*,[3] the public policy defense

---

[3] In contrast, the Ninth Circuit has confirmed the continued validity of "manifest disregard of the law" post-*Hall Street*, finding that it "remains a valid ground for vacatur" under the FAA "because it is a part of § 10(a)(4)." *Comedy Club, Inc. v. Improv W. Associates*, 553 F.3d 1277, 1290 (9th Cir. 2009). No other non-statutory grounds for vacating an award were discussed in *Comedy Club*.

16-cv-00857-RMW
ORDER GRANTING PETITION TO CONFIRM ARBITAL AWARD
FC

1    appears to have survived. The Ninth Circuit has considered the public policy defense in at least

2    one FAA case after *Hall Street*. *See Lagstein v. Certain Underwriters at Lloyd's, London*, 607

3    F.3d 634, 641 n.4 (9th Cir. 2010) (rejecting district court's conclusion that award contravened

4    public policy because finding was based only on district court's "generalized view of public

5    policy," rather than "an overriding public policy rooted in something more than general

6    considerations of supposed public interests") (citing *Stead Motors of Walnut Creek v. Auto.*

7    *Machinists Lodge No. 1173,* 886 F.2d 1200, 1212-13 (9th Cir.1989) (en banc)). Although the

8    Ninth Circuit noted in *Lagstein* that "manifest disregard" survives *Hall Street*, the court

9    considered the public policy defense argument without assessing its continued validity. 607 F.3d

10   at 641 nn.4-5. The Eastern District of California has also considered whether to vacate an FAA

11   award on public policy grounds, again without explicitly stating that the public policy defense

12   survives *Hall Street*. *See City of Alturas v. Adkins Consulting Engineers, Inc.*, No. 2:13-CV-

13   00354-TLN, 2014 WL 1255848, at *6 (E.D. Cal. Mar. 26, 2014) ("Ninth Circuit recognizes a

14   narrow exception to enforcement of arbitration awards under the FAA when an award is contrary

15   to public policy.") (citing *Matthews*, 688 F.3d at 1111; *Aramark*, 530 F.3d at 823; and *Stead*

16   *Motors*, 886 F.2d at 1212-13). The court is not aware of any authority in this circuit suggesting

17   that the judicially-created public policy defense is unavailable after *Hall Street*.

18          In keeping with Supreme Court and Ninth Circuit precedent, the court concludes that an

19   arbitration award within the purview of the FAA may be vacated if the court finds that

20   enforcement would violate 1) an "explicit, well defined and dominant public policy" that 2)

21   "specifically militates against the relief ordered by the arbitrator." *City of Alturas*, 2014 WL

22   1255848, at *6 (citing *Aramark*, 530 F.3d at 823).

23                          **3.   Standard for Review of Arbitrator's Conclusions**

24          Sony asserts that the public policy question requires de novo review of the arbitrator's

25   conclusions. See Dkt. No. 38 at 12 (citing *Titan Tire*, 734 F.3d at 717 ("once a public policy

26   question is raised, we must answer it by taking the facts as found by the arbitrator, but reviewing

27   the arbitrator's conclusions de novo") (internal citations omitted); *Gulf Coast Indus. Workers*

28

United States District Court
Northern District of California

9

*Union v. Exxon Co., USA*, 991 F.2d 244, 249 (5th Cir. 1993)). Sony further argues that the interpretation of the arbitration contract is a matter of law, requiring de novo review by this court. Dkt. No. 38 at 12 (citing *Westport Ins. Corp. v. N. California Relief*, 76 F. Supp. 3d 869, 878 (N.D. Cal. 2014) ("under California law, the interpretation of a contract, including the resolution of any ambiguity, is a question of law for the court")). Immersion asserts that there is no support for applying de novo review of an arbitration award under the FAA. Dkt. No. 45 at 4-5. The court is not convinced that de novo review of the arbitrator's interpretation of the 2007 arbitration agreement is appropriate.

Sony does not dispute that the arbitrator had the authority to determine whether invalidity defenses were within the scope of arbitration. Dkt. No. 55 at 4 ("There is no dispute that the arbitrator had authority to decide this issue, which was specifically tendered by the parties."). A "court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *see also E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 61-62 (2000) (where parties have "'bargained for' the 'arbitrator's construction' of their agreement," and courts will "set aside the arbitrator's interpretation of what their agreement means only in rare instances") (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960)). De novo review is not appropriate because the parties agreed that the arbitrator would interpret the contract, and an "arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his determination on the merits." *Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 733 (9th Cir. 2006) ("policy concerns requiring deference to the arbitrator's decision on the merits are equally applicable when reviewing the arbitrator's interpretation of the submission agreement"); *cf. Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 n.2 (2013) (noting that a court may review de novo an arbitrator's arbitrability determination absent clear evidence that the parties wanted the arbitrator to decide the issue).

The authority cited by Sony does not suggest otherwise. While contract interpretation may be a question of law under California law, that alone does not mean that de novo review should

16-cv-00857-RMW
ORDER GRANTING PETITION TO CONFIRM ARBITAL AWARD
FC

United States District Court
Northern District of California

apply to an arbitrator's award. The role of an arbitrator requires reaching conclusions of law, yet confirmation by the court "is required even in the face of . . . misinterpretations of law." *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986) (internal citation omitted). To the extent that the cases from other circuits cited by Sony call for de novo review of an "arbitrator's conclusions" on anything other than "the public policy question" itself, which is not at all clear, such cases find no support in Ninth Circuit precedent. *See Aramark*, 530 F.3d at 823 ("In reviewing an arbitral award for possible violations of public policy . . . a court is not authorized to revisit or question the fact-finding *or the reasoning* which produced the award.") (emphasis added) (quoting *Int'l Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 716 (2d Cir. 1998)); *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists & Aerospace Workers*, 886 F.2d 1200, 1211 (9th Cir. 1989) ("Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task") (quoting *Misco*, 484 U.S. at 45)).

For purposes of evaluating whether public policy makes the award unenforceable, the court considers the agreement as construed by the arbitrator. *See E. Associated Coal*, 531 U.S. at 61-63 (adopting arbitrator's interpretation of contract for purposes of evaluating whether award violates public policy); *W.R. Grace*, 461 U.S. at 766 ("If the contract *as interpreted* by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it.") (emphasis added). In this case, the arbitrator construed the 2007 agreement to exclude arbitration of invalidity defenses from its scope. The court must assess whether an award based on the arbitration agreement as interpreted by the arbitrator violates a well-defined public policy.

### 4.   Whether Public Policy Specifically Militates Against Enforcement

Relying *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) and *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362 (Fed. Cir. 2001), Sony identifies a public policy favoring "the full and free use of ideas in the public"—specifically a policy against restricting attacks on patent validity. *Lear*, 395 U.S. at 674, 670 (1969). Sony argues that the Federal Circuit applied this policy in *Flex-Foot* to hold that an invalidity defense may be excluded only if a clear and unambiguous waiver is found. 238 F.3d

11

at 1370. Sony argues that the arbitration award violates public policy because the arbitrator excluded its invalidity defense from the scope of the arbitration even though Sony did not clearly and unambiguously waive the defense. Immersion does not suggest that Sony clearly and unambiguously waived its invalidity defense. Rather, Immersion argues that the public policy identified by Sony is irrelevant to the arbitrator's determination that the invalidity defenses was not within the scope of the parties' agreement to arbitrate. The court finds that public policy does not specifically militate against enforcement of the arbitration award in this case.

> **a.** **Public Policy in *Lear* and *Flex-Foot***

In *Lear*, the Supreme Court rejected the doctrine of license estoppel, which previously operated to prevent a licensee from challenging the validity of the licensor's patent in a suit for royalties under the license agreement. 395 U.S. at 656. While recognizing that "the law of contracts forbids a purchaser to repudiate his promises simply because he later becomes dissatisfied with the bargain he has made," the Court found that such policy interests were outweighed by the "important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain," noting that licensees "may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery." 395 U.S. at 668-670. Therefore, the Court held that a licensee was not estopped from challenging validity based on an earlier settlement agreement licensing the patent.

In *Flex-Foot*, an accused infringer had waived "any and all invalidity and unenforceability defenses in any future litigation, arbitration, or other proceeding" in a settlement agreement. 238 F.3d at 1364. The Federal Circuit considered whether the waiver contractually estopped the accused infringer from asserting an invalidity defense in a subsequent infringement suit on the same patent. The Federal Circuit weighed "the important policy of enforcing settlement agreements" against "the federal patent laws' prescription of full and free competition in the use of ideas that are in reality a part of the public domain," and found that the accused infringer was contractually estopped "[b]ased on the clear and unambiguous waiver" of its invalidity defenses "in the settlement agreement voluntarily entered into by the parties." 238 F.3d at 1370; *see also*

12

1    *Baseload,* 619 F.3d at 1362 ("invalidity and unenforceability claims may be released, but only if

2    the language of the agreement or consent decree is clear and unambiguous"). Sony requests that

3    this court "apply the same analysis used by the Federal Circuit in *Flex-Foot*." Dkt. No. 55 at 1.

4    Immersion does not dispute that these cases establish a public policy, but argues that the policy is

5    not relevant because the arbitration award does not prevent Sony from challenging validity. Dkt.

6    No. 45 at 15-16.

7                    **b.        Arbitrator's Determination of Scope of Arbitration Agreement**

8            During the arbitration proceedings, Sony asserted an invalidity defense, and Immersion

9    objected that invalidity was not within the scope of the agreement to arbitrate. Dkt. No. 38-6 at 2.

10   The parties briefed the issue, and the arbitrator issued Order No. 3, considering Sections 4.3, 5.1,

11   and 9.17 of the 2007 agreement and concluding that invalidity and unenforceability were not

12   within the scope of the agreement to arbitrate. *Id.* at 13.

13           Section 4.3 of the 2007 Agreement addresses disputes "as to whether a particular product

14   or service of the Sony Entities is Royalty Bearing Product" and sets forth certain procedures for

15   arbitration. Dkt. No. 37-4 ¶ 4.3(a). Under the first step of the arbitration procedure set forth in the

16   agreement, "if need be, the arbitrator shall first determine whether the allegedly infringing

17   products or services fall within the definition of the Gaming Field of Use." *Id.* ¶ 4.3(a)(1). If the

18   accused products or services do fall within the definition, "the arbitrator shall then determine if the

19   product or service falls within any license granted within this Agreement and whether or not the

20   allegedly infringing products are covered by one or more of the Immersion Patents." *Id.* ¶

21   4.3(a)(2). Section 4.3(d) provides that the parties "shall have no obligation to arbitrate any claim

22   or dispute other than those expressly set forth in Sections 4.3(a) and 4.3(b)." *Id.* ¶ 4.3(d). In Order

23   No. 3, the arbitrator found that Section 4.3 did not expressly set forth an obligation to arbitrate a

24   dispute over invalidity or unenforceability. Dkt. No. 38-6 at 12.

25           Section 5.1(a)(i) deals with Sony's covenant not to sue. Sony's covenant not to sue will

26   terminate if Immersion sues Sony for patent infringement on any patents in fields of use *other* than

27   the Gaming Field of Use. Dkt. No. 37-4 ¶ 5.1(a). Section 5.1(a)(i) goes on to state that "[i]n any

28

United States District Court
Northern District of California

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

event the Sony Entities shall be free to assert any defenses with respect to the patents sued upon or arbitrated, including but not limited to defenses of invalidity and unenforceability of such patents." The arbitrator determined that Section 5.1 was only triggered by circumstances that would terminate the covenant not to sue—specifically, a suit by Immersion asserting a non-Gaming Field of Use patent, whether or not the asserted patent that had been "arbitrated" for purposes of determining field of use under step 1 of Section 4.3(1). *See* Dkt. No. 38-6 at 7-10. Notwithstanding the "in any event" language, the arbitrator found that the sentence did not apply to "an arbitration of a product in the 'Gaming Field of Use'"—the arbitration at issue in this case. *Id.* at 8. The arbitrator concluded that Section 5.1 did not bring invalidity within the scope of arbitration. *Id.* at 13.

Section 9.17 deals with the termination of licenses and covenants not to sue. Dkt. No. 37-4 ¶ 9.17. The arbitrator interpreted this section to permit Sony to challenge the validity or enforceability of any Immersion patents "in any judicial or administrative proceeding," but noted that any such challenge would give Immersion the power to terminate certain licenses and covenants. Dkt. No. 38-6 at 12 (quoting Dkt. No. 37-4 ¶ 9.17(a)(i)). The arbitrator interpreted Section 9.17 such that "a dispute under section 4.3 would not provide Immersion with a basis for terminating licenses or covenants." *Id.* at 13. The arbitrator concluded that Section 9.17 did not bring invalidity within the scope of arbitration. *Id.*

### c.    Whether Arbitration Agreement Violates Public Policy

The arbitrator effectively estopped Sony from asserting an invalidity defense based on an earlier settlement agreement. So far as they go, these facts line up with those in *Lear* and *Flex-Foot*. However, the arbitrator in this case defined only the scope of the arbitration itself—he did not assess whether the terms of the settlement agreement affected Sony's ability to challenge the validity of any Immersion patents outside of the arbitration context. *See* Dkt. No. 38-6 at 12 n.12 ("Immersion contends that the Sony Entities may challenge or dispute the validity or enforceability of any of the Immersion Patents in any judicial or administrative proceeding. The Arbitrator declines to comment on the accuracy of this contention."). The issue raised in this case is whether Sony has a right to raise an invalidity defense even if the parties' agreed to arbitrate

14

1    infringement alone.

2        Sony argues that *Flex-Foot* makes "clear that the public policy considerations at issue" in

3    *Lear* "apply in the arbitration context as well." Dkt. No. 38 at 12; Dkt. No. 55 at 5. However,

4    *Flex-Foot* does not address an *arbitrator's* exclusion of invalidity defenses. Rather, the Federal

5    Circuit considered the district court's decision to consider Springlite's invalidity defense post-

6    arbitration.[4] The waiver in *Flex-Foot* was clear and ambiguous—there is no reason to think that

7    the Federal Circuit would have permitted the accused infringer to assert an invalidity defense in

8    any proceeding. But it is important to note that *Flex-Foot* does not hold that clear and

9    unambiguous waiver is required in order to exclude invalidity defenses *from arbitration*. Nor does

10   *Flex-Foot* hold that public policy militates against an agreement to arbitrate infringement without

11   invalidity.

12       "[I]nfringement and invalidity are separate matters under patent law," and there is no

13   requirement that they be determined in the same proceeding. *Commil USA, LLC v. Cisco Sys.,

14   Inc.*, 135 S. Ct. 1920, 1928-29 (2015) ("To be sure, if at the end of the day, an act that would have

15   been an infringement or an inducement to infringe pertains to a patent that is shown to be invalid,

16   there is no patent to be infringed. But the allocation of the burden to persuade on these questions,

17   and the timing for the presentations of the relevant arguments, are concerns of central relevance to

18   the orderly administration of the patent system."). "Though an invalid claim cannot give rise to

19   liability for infringement, whether it is infringed is an entirely separate question capable of

20   determination without regard to its validity." *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 320

21   F.3d 1354, 1365 (Fed. Cir. 2003) (quoting *Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d

22   1563, 1583 (Fed.Cir.1983)). An agreement to arbitrate infringement but not invalidity does not, by

23

24   _____

     [4] The arbitration clause in *Flex-Foot* stated that "[a]ny decision by arbitration shall be limited to the issue of whether a product made, used or sold . . . falls within the scope of patent claims of any patent . . ." 238 F.3d at 1366. While the dispute was arbitrated and the panel found infringement, and the "arbitration award did not address Springlite's challenge to the validity of the '363 patent." 238 F.3d at 1364, 1367. Subsequently, Springlite "filed a motion with the district court to vacate the award and consider the invalidity defense." Parts A and B of the Federal Circuit's analysis address the arbitration award and the district court's affirmance thereof, while part C of the Federal Circuit's analysis focuses solely on review of "the *district court*'s holding" that Springlite was estopped from challenging the validity of the patent. *Id.*at 1366-67 (emphasis added).

25

26

27

28

16-cv-00857-RMW
ORDER GRANTING PETITION TO CONFIRM ARBITAL AWARD
FC

United States District Court
Northern District of California

1   itself, prevent a party from challenging patent validity outside of the arbitration.

2       Furthermore, the *Lear* policy goals are not implicated in an arbitration proceeding the same

3   way they are in civil litigation or patent office proceedings. While a finding of invalidity by an

4   arbitrator might relieve the challenger of an obligation to pay royalties, it does not promote "full

5   and free competition in the use of ideas" because it is binding only on the parties to the arbitration.

6   *Lear*, 395 U.S. at 670. The public might be served by an arbitrator's invalidity determination if the

7   accuses infringer lowered its prices, but the covered technology would not be returned to the

8   public domain and the competition would still be "repressed by worthless patents." 395 U.S. at

9   664 (1969). Therefore, the court is not convinced that public policy specifically militates against

10  the parties' agreement to arbitrate infringement only.

11      Sony responds that if is not permitted to raise invalidity as a defense in arbitration, "it is

12  then put to the Hobson's choice of abandoning invalidity altogether or renouncing important

13  contractual benefits that it has already paid for." Dkt. No. 55 at 5-6. Section 9.17 of the 2007

14  agreement allows Immersion to terminate Sony's licenses if Sony challenges the validity of

15  Immersion's patents in other "judicial or administrative" proceedings. Sony argues that

16  termination provision effectively estops Sony from raising invalidity in any proceedings, and

17  therefore the arbitration agreement implicates the *Lear* public policy concerns.

18      The arbitrator was authorized to determine the scope of the arbitration agreed to by the

19  parties. Accordingly, the arbitrator considered Section 9.17 only as it related to the scope of

20  arbitration, determining that Section 9.17's termination provision was not triggered by the

21  arbitration and that Section 9.17 did not bring Sony's invalidity defense within the scope of the

22  arbitration. The arbitrator explicitly declined to consider whether the 2007 agreement permitted

23  Sony to challenge validity in any judicial or administrative proceeding. *See* Dkt. No. 38-6 at 12

24  n.12. Section 9.17 itself may violate public policy under *Lear* if it prevents Sony from challenging

25  validity of Immersion's patents, but the enforceability of the termination provision is not before

26  this court. The arbitrator found that Section 9.17 was unrelated to the scope of the arbitration. The

27  existence of an unrelated termination provision does not expand the scope of the parties'

28
16-cv-00857-RMW
ORDER GRANTING PETITION TO CONFIRM ARBITAL AWARD
FC

United States District Court
Northern District of California

1    arbitration agreement or invalidate an agreement to arbitrate infringement alone. The court finds

2    no public policy basis for vacating the award.

3               **B.  Refusal to Hear Evidence Pertinent and Material to the Controversy**

4         Under 9 U.S.C § 10(a)(3), a court may vacate an award "where the arbitrators were guilty

5    of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to

6    hear evidence pertinent and material to the controversy; or of any other misbehavior by which the

7    rights of any party have been prejudiced." "Arbitrators enjoy wide discretion to require the

8    exchange of evidence, and to admit or exclude evidence, how and when they see fit." *U.S. Life Ins.*

9    *Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1175 (9th Cir. 2010) (internal quotation omitted). To

10   meet the standard for vacating the award, the arbitrator's refusal to hear evidence "must

11   demonstrate bad faith or be so gross as to amount to affirmative misconduct." *Misco*, 484 U.S. at

12   40. Sony argues that the award should be vacated because the arbitrator refused to hear prior art

13   evidence "pertinent and material" to the infringement controversy. Dkt. No. 38 at 16 (citing 9

14   U.S.C. § 10(a)(3)). The court concludes that the arbitrator was not guilty of misconduct in refusing

15   to give weight to the prior art evidence of non-infringement.

16        The parties stipulated that Japanese patent law would apply to the infringement question

17   Dkt. No. 38-4 at 10. In the Final Award, the arbitrator addressed Immersion's need to show,

18   among other thing, that the DS4 Wireless Controller was an "indispensable component for how

19   the '301 Patent resolved the problem of providing tactile sensations to a plurality of users" in

20   order to prove indirect infringement under Japanese law. *Id.* at 13. Sony argues that a component

21   cannot be "indispensable" if it existed in the prior art, and that the arbitrator refused to hear prior

22   art evidence that "would have established that the relevant structure and operation of the accused

23   DualShock®4 controller was well-known in the prior art." Dkt. No. 38 at 8.

24        In an Interim Final Award, the arbitrator "declined to give weight to Sony's evidence and

25   argument that infringement is precluded by prior art." Dkt. No. 38-3 at 8 n.2. The arbitrator

26   reasoned that Sony's argument "was tantamount to an affirmative defense," and therefore outside

27   the scope of the arbitration, even though "such an inquiry might be appropriate in an infringement

28

United States District Court
Northern District of California

17

1  litigation before a court in Japan." *Id.* Sony argues that even if the arbitrator correctly excluded

2  invalidity defenses, the arbitrator had no basis for ignoring prior art evidence relating to

3  infringement.

4       The court is not persuaded by Immersion's arguments that the arbitrator evaluated Sony's

5  prior art evidence and argument *after* declining to do so in the Interim Order. Dkt. No. 45 at 18.

6  According to Immersion, the parties' subsequent stipulation to a revised translation of the

7  Japanese patent statute simplified the questions of the law for the arbitrator, and the arbitrator fully

8  addressed the indispensability requirement in the Final Award. *Id.* However, the court finds no

9  basis to conclude that arbitrator revisited this question—the arbitrator did not reference prior art in

10  connection with infringement in any subsequent orders. Nor is the court persuaded by

11  Immersion's argument that Sony withdrew certain prior art evidence; the testimony appears to

12  relate only to Sony's assertion of a good-faith belief of invalidity, and not the "indispensability"

13  requirement for infringement. *See* Dkt. No. 45 at 18.

14       However, the arbitrator's decision not to give weight to the prior art evidence does not

15  constitute refusal to hear pertinent and material evidence under §10(a)(3). The court is somewhat

16  troubled by the arbitrator's conclusion that consideration of such evidence and argument would

17  fall outside the scope of the arbitration—even if it were relevant to the infringement inquiry under

18  Japanese law. However, Sony presented such evidence and argument to the arbitrator, and

19  arbitrator decided not to give it weight, viewing it as equivalent to an invalidity argument. The

20  arbitrator solicited comments from the parties on his interim orders, including the order in which

21  he declined to give weight to the prior evidence. Dkt. No. 38-13 at 1. Sony did not state any

22  objections at that time, but reserved its right to state objections if the interim award was not made

23  final. *Id.* Sony did object in a later a brief. Dkt. No, 38-10 at 8-11. This process "allowed the

24  parties to present material evidence because the parties were allowed to address why the

25  reviewers' conclusions were incorrect." *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d at

26  1174-75 (distinguishing from cases where arbitrator mislead a party into believing evidence was

27  admitted and where arbitrator prevented party from presenting its proof). Therefore, the court

28

18

16-cv-00857-RMW
ORDER GRANTING PETITION TO CONFIRM ARBITAL AWARD
FC

finds no basis under § 10(a)(3) for vacating the award.[5]

**C. Manifest Disregard of the Law**

Under 9 U.S.C § 10(a)(4), a court may vacate an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." Manifest disregard of the law "is a part of § 10(a)(4)." *Comedy Club, Inc. v. Improv W. Associates*, 553 F.3d 1277, 1290 (9th Cir. 2009). For an arbitrator's award to be in manifest disregard of the law, "it must be clear from the record that the arbitrator recognized the applicable law and then ignored it." *Comedy Club*, 553 F.3d at 1290 (internal citations omitted). Sony argues that the arbitrator manifestly disregarded Japanese patent law by recognizing that indirect infringement must be predicated on a direct infringement, yet awarding royalties for indirect infringement without first determining the extent of alleged direct infringement by consumers. The court concludes that the arbitrator did not manifestly disregard the law on indirect infringement.

In the Final Award, the arbitrator found that Immersion had to establish the following elements to prove indirect infringement under Article 101(ii):

> (1) Immersion was granted the '301 Patent for an invention of a product for providing tactile sensations to a plurality of users; (2) as a business, Sony manufactured, sold or distributed a DS4 Wireless Controller in Japan to be used for the producing of the "301 patent invention;" (3) the DS4 Wireless Controller was a specialty product; (4) the DS4 Wireless Controller was an indispensable component for how the '301 Patent resolved the problem of providing tactile sensations to a plurality of users; (5) at the time Sony manufactured, sold or distributed the DS4 Wireless Controller , Sony knew that Immersion owned the patented invention and knew that the DS4 Wireless Controller was used to work the '301 patented

---

[5] Sony also argues that the award should be vacated under §10(a)(4) because the arbitrator manifestly disregarded the law in refusing to weigh Sony's prior art evidence. Dkt. No. 38 at 16 n.2. However, "to demonstrate manifest disregard, the moving party must show that the arbitrator understood and correctly stated the law, but proceeded to disregard the same." *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007) (internal quotation omitted). Sony has not identified any understanding or statement of the law that the arbitrator proceeded to disregard. At most, the arbitrator indicated that consideration of prior art "*might* be appropriate in an infringement litigation" in Japan. Dkt. No. 38-3 at 8 n.2 (emphasis added). The arbitrator concluded that Sony's argument was "tantamount" to an invalidity defense. *Id.* While the arbitrator may not have correctly interpreted Japanese law, a court "may not reverse an arbitration award even in the face of an erroneous interpretation of the law." *Collins*, 505 F.3d at 879.

invention.

Dkt. No. 38-4 at 13. The arbitrator concluded that Immersion proved infringement under Article 101(ii). *Id.*

The arbitrator addressed Sony's objection that "a finding of direct infringement is a prerequisite to a finding of indirect infringement:"

> [T]the Arbitrator finds no inconsistency between that proposition and JPA Article 101(ii). Article 101(ii) recites that the component must be produced knowing that it is used to produce an end product that 'works' the invention. *Working the invention is direct infringement.* Thus, a patentee must prove that a component is used to directly infringe the patent before liability can be imposed on the producer of the component. *In this case, Immersion proved the DS4 Wireless Controller is used by consumers to work the '301 patent.*

*Id.* at 18 (emphases added). The arbitrator reiterated this conclusion:

> Before liability can be imposed for indirect infringement under Article 101(ii), the patentee must prove that the accused infringer commercially produced components knowing that they are *used [by a third party] to work the patented invention.* Thus liability for indirect infringement (commercial production of component) is premised on a finding of direct infringement (". . . used to work the patented invention."). Immersion proved that Sony commercially produced DS4 Wireless Controllers knowing that they are used by consumers to create a multiple-player product that directly infringes by practicing each element of the claim pertaining to vibrotactile units.

*Id.* at 22-23 (emphasis in original). These passages indicate that the arbitrator applied the law consistently with his statement of the law. The arbitrator considered Sony's objection in the Final Award, but concluded that Immersion had proved the necessary direct infringement predicate to a finding of indirect infringement. It cannot be said that the arbitrator recognized and then ignored the law.

Sony argues that the arbitrator's finding of indirect infringement based on a general finding that "DS4 Wireless Controller is used by consumers to work the '301 patent" is inconsistent not only with Japanese law, but also with the arbitrator's earlier findings on direct infringement as incorporated into the Final Award. However, the court cannot vacate an award even if the arbitrator misunderstood and misapplied the relationship between direct and indirect infringement under Japanese law: "'Manifest disregard of the law' means something more than just an error in the law or a failure on the part of the arbitrators to understand or apply the law." *Lagstein*, 607

20

F.3d at 641 (citing *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.,* 44 F.3d 826, 832 (9th Cir.1995)). Therefore, the court finds no basis under §10(4)(a) for vacating the award.[6]

### III.   REQUEST FOR ATTORNEY'S FEES

Immersion requests an award of attorney's fees. Dkt. No. 45 at 22-23. This court has the authority to award attorney's fees "when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d at 1104 (quoting *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983)). "An unjustified refusal to abide by an arbitrator's award, moreover, may equate an act taken in bad faith, vexatiously or for oppressive reasons." *Id.* (internal citations omitted). Sony's arguments against confirmation do not prevail in this case; however, the court is not convinced that Sony acted in bad faith in challenging the award. Therefore, Immersion's request is denied.

### IV.   CONCLUSION

For the foregoing reasons, Sony's motion to vacate the award is denied. Immersion's petition to confirm the award is granted. Immersion's request for attorney's fees is denied.

The court has filed this order under seal. If either party believes that any portion discloses confidential information, the party must file an administrative motion to file under seal within 14 days of this order. The motion must be accompanied by an unredacted version of the order, filed under seal, highlighting the portions of the order that the party seeks to seal. The motion must also be accompanied by a declaration establishing that such portions of the order are sealable. No proposed order or redacted version of the order need be filed. If neither party moves to seal any

---

[6] Sony also argues in a footnote that § 10(a)(3) provides "a further basis" for vacating the award because the arbitrator refused to hear Sony's "evidence regarding the limited extent of any alleged royalties." Dkt. No. 38 at 20 n.3. Sony's citation to a hearing transcript indicates that the arbitrator believed damages calculations to be outside the scope of the arbitration: "I came into this assuming that once that issue was decided, it was purely a mathematical computation that the parties would be doing on damages." Dkt. No. 38-14, 155:6-8. The court finds nothing to suggest bad faith or affirmative misconduct by the arbitrator in refusing to consider sales numbers. *See Misco*, 484 U.S. at 40 (refusal to hear evidence "must demonstrate bad faith or be so gross as to amount to affirmative misconduct").

16-cv-00857-RMW
ORDER GRANTING PETITION TO CONFIRM ARBITAL AWARD
FC

United States District Court
Northern District of California

part of this order with 14 days, this order will be made public in its entirety.

**IT IS SO ORDERED.**

Dated: April 26, 2016

*Ronald M. Whyte*

Ronald M. Whyte
United States District Judge

16-cv-00857-RMW
ORDER GRANTING PETITION TO CONFIRM ARBITAL AWARD
FC

United States District Court
Northern District of California